UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STAHL YORK AVENUE CO., LLC,

                      Plaintiff,

      – against –

THE CITY OF NEW YORK and THE NEW
YORK CITY LANDMARKS PRESERVATION
COMMISSION,

                  Defendants.

**OPINION AND ORDER**
14 Civ. 7665 (ER)

Ramos, D.J.:

      This year marks the fiftieth anniversary of New York City's Landmarks Preservation

Law ("Landmarks Law"). When it was enacted, in 1965, the Landmarks Law aimed to "protect

historic landmarks and neighborhoods from precipitate decisions to destroy or fundamentally

alter their character"; "foster[] civic pride in the beauty and noble accomplishments of the past";

"enhanc[e] the city's attractions to tourists and visitors"; "support[] and stimulat[e] business and

industry"; "strengthen[] the economy of the city"; and "promot[e] the use of historic districts

[and landmarks] . . . for the education, pleasure and welfare of the people of the city." *Penn

Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 109 (1978) (quoting N.Y.C. Admin. Code,

ch. 8–A, § 205–1.0(a)-(b)) (internal quotation marks omitted). Like many urban landmarks laws,

New York City's pursues these goals not by facilitating public acquisition of historic properties,

but by providing incentives to encourage preservation by private owners and by placing certain

restrictions on historic properties while ensuring that property owners can earn a "reasonable

return" on their investments and have "maximum latitude to use their parcels for purposes not

inconsistent with the preservation goals." *Id.* at 109-10.

This action stems from such a restriction:  a decision by the New York City Landmarks Preservation Commission (the "LPC" or "Commission"), an agency created by the Landmarks Law, to designate as landmarks two buildings (the "Subject Buildings") on Manhattan's Upper East Side and limit the owner's right to redevelop those properties.  Plaintiff Stahl York Avenue Co., LLC ("Stahl" or "Plaintiff") alleges that by designating these properties as landmarks and subsequently denying Stahl recourse in the form of a preliminary "hardship" finding, the Commission and the City of New York (the "City" and, together with the Commission, "Defendants") violated its substantive due process rights.  In a separate action filed in the New York State Supreme Court, Stahl challenges the Subject Buildings' landmarks designation as an unconstitutional taking and claims that Defendants behaved arbitrarily and capriciously when they denied Stahl's Hardship Application.

Before the Court is Defendants' motion to dismiss the instant Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Doc. 14.  For the reasons set forth below, their motion is GRANTED pursuant to Rule 12(b)(6).

## I.    BACKGROUND[1]

### A.    The Subject Buildings and the First Avenue Estate

During the early 20th century, the City and Suburban Home Company ("CSHC"), a philanthropic corporation that existed from 1896 to 1961, commissioned construction of several "light-court" style tenement complexes in Manhattan intended to diverge from the "dark and unventilated" housing typically available at that time to New York City's working poor.  *Stahl*

---

[1] The following facts, accepted as true for purposes of the instant motion, are based on the allegations in the Complaint.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012) (evaluating a Rule 12(b)(6) motion); *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)) (evaluating a Rule 12(b)(1) motion).

*York Ave. Co., LLC v. City of New York*, 76 A.D.3d 290, 292 (1st Dep't 2010); Compl. ¶ 27.[2]

One such complex was the First Avenue Estate ("FAE"), a group of buildings occupying the full

city block ("block 1459") bounded by York Avenue, First Avenue, East 65th Street, and East 64th

Street.  *Id*. ¶ 19.  Comprised of fifteen six-story buildings—each featuring courtyards, stairwells,

hallways, and apartments designed to receive maximal exposure to light and air—the FAE was

considered "an important achievement in the social housing movement."  *Stahl*, 76 A.D.3d at

292; Moston Decl. Supp. Def.'s Mot. to Dismiss (Doc. 15), Ex. B at 2.

Thirteen of the fifteen buildings comprising the FAE were built on a single plot of land

purchased by CSHC in 1896.  Compl. ¶ 28.  Construction on these buildings (the "Original

Buildings"), which were designed by renowned architect James Ware, was completed in 1906.

*Id.*  At the time, CSHC did not intend for the FAE to cover the entirety of the block.  *Id.* ¶ 29.

But in 1913, eighteen years after CSHC purchased the plot of land and seven years after the

Original Buildings were constructed, CSHC purchased the plot of land covering the remainder of

block 1459, on which the Subject Buildings now sit.  *Id.* ¶ 29.  The Subject Buildings, which

were designed not by Ware, but by Philip Ohm, an "undistinguished" architect employed by

CSHC, were completed in 1915.  *Id.*  Stahl alleges that, together, these two "architecturally

insignificant six-story walk-up tenement-style apartment buildings" consist of "190 poorly

designed, warren-like apartments."  *Id.* ¶ 18, 21.  Decades later, in 1977, Stahl acquired the entire

FAE "for its future development potential."  *Id*. ¶ 20.

---

[2] As a matter of course, courts may consider documents outside the pleadings when ruling on a 12(b)(1) motion.  *See Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).  When ruling on a 12(b)(6) motion, the Court generally must confine itself to the four corners of the complaint and look only to the allegations therein.  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).  However, a court may also consider allegations in documents or statements that are either attached to the complaint, incorporated by reference or integral to the complaint, provided that there is no dispute regarding their authenticity, accuracy or relevance.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted).  The Court, therefore, may properly consider prior judicial and administrative decisions referenced in and integral to Stahl's Complaint.

### B.       The 1990 Landmarks Designation

On April 24, 1990, the Commission voted to designate the FAE as a landmark.  *Id.* ¶ 31.
The Commission's formal designation report (the "1990 Report") focused primarily on the
historic importance of the thirteen Ware-designed Original Buildings.  *Id.*  With regard to the
Ohm-designed Subject Buildings at issue here, the 1990 Report stated that "the similarities in
size, scale, use of materials, and decorative detailing between the various buildings on the block
creates a strong sense of visual homogeneity."  *Id.*  The Commission noted that the designation
would cover "one of the only two full city block developments of light-court model tenements in
the country."  *Id.*[3]

However, the Commission's 1990 vote was not final.  The Board of Estimate (the "BOE"
or "Board"), a now-defunct entity which, at that time, had statutory authority to review, overturn,
or modify all LPC landmark designations, voted on August 21, 1990 to modify the FAE
designation by exempting the Subject Buildings, upholding landmark status only for the thirteen
Original Buildings.  *Id.* ¶ 4, 32.  The Board reasoned that classifying the two later-constructed
Subject Buildings as landmarks "would have precluded new as-of-right construction" on a "very
large site[] . . . in [a] high tax-producing area," and that "it was important to allow for such
development in the future."[4]  *Id.*  Coincidentally, the meeting at which the Board of Estimate
voted to modify the FAE designation was its last.  *Id.*  In 1989, the United States Supreme Court
had held its structure unconstitutional, *see Bd. of Estimate of the City of New York v. Morris*, 489
U.S. 688 (1989)), prompting a revision to the New York City Charter that re-assigned the

---

[3] At the same time, the Commission accorded landmark status to the York Avenue Estate ("YAE"), another full-
block light-court tenement complex nearby, designed entirely by Ohm.  Compl. ¶ 30.  The YAE, which was then
owned by the Kalikow 78/79 Company, is bounded by East 78th Street, York Avenue, East 79th Street, and what is
now the Franklin Delano Roosevelt Drive.  *Id.* ¶ 31.

[4] During that meeting, the Board also modified the YAE landmarks designation, voting to exclude from designation
four buildings on the complex's eastern side.  *Stahl*, 76 A.D.3d at 292, 297.

Board's role in reviewing landmark designations to the City Council.  *Stahl*, 76 A.D.3d at 300;
Defs.' Mem. L. Supp. Mot. to Dismiss at 4 n. 2 (Doc. 16).

Stahl did not challenge the landmark designation imposed on the Original Buildings
"because its ability to develop the [Subject] Buildings was left intact, as was the option to
transfer unused development rights from the [Original] Buildings to the un-landmarked [Subject]
Buildings."  Compl. ¶ 33.  The City, meanwhile, did not challenge the BOE's decision to exempt
the Subject Buildings from the 1990 landmark designation.  *Id.*  Several community groups,
however, united under the name "Coalition to Save City and Suburban Housing Inc.,"
commenced Article 78 proceedings in New York State Supreme Court to challenge the Board's
modification decision.  *See Coalition to Save City and Suburban Housing Inc. v. City of New
York and Stahl Avenue Co.*, Index No. 280680/90 (Sup. Ct. N.Y. Co. 1990).[5]  The Supreme
Court dismissed their petition on July 17, 1991, concluding that the Board had reached an
"inherently reasonable" compromise that balanced the goal of preserving Stahl's development
rights with the goal of protecting the majority of the FAE, "which [was] significant not for [its]
architectural merits, but the historical significance of housing created for the working poor."
Compl. ¶ 33.  The Coalition did not appeal.  Doc. 16 at 4-5.

### C.    Stahl's 2004 Plans to Develop the Subject Buildings

More than a decade later, in 2004, Stahl "began to take steps" to develop the Subject
Buildings.  Compl. ¶ 35.  By that time, Stahl maintains, the estimated potential value of the
Subject Buildings, if developed, "vastly exceeded" their existing value.  *Id.*  Stahl alleges that the
apartments in the Subject Buildings were, and are, "of substandard quality by modern

---

[5] The same coalition filed a separate petition challenging the Board's modification of the YAE designation.  *See
Coalition to Save City and Suburban Housing Inc. v. City of New York and Kalikow* ("*Kalikow*"), *78/79 Co.*, Index.
No. 25980/90 (Sup. Ct. N.Y. Co. 1990).  The two actions were consolidated prior to their dismissal.

standards": "They lack all modern amenities, appliances, and fixtures, and are extremely small, with an average of approximately 370 leasable square feet per apartment." *Id.* ¶ 21. Moreover, the units are arranged "in many ways unfit for modern tenants," with bedrooms too small to fit queen-sized beds and "abnormally-shaped bathrooms that cannot accommodate normal fixtures." *Id.* Meanwhile, the Subject Buildings themselves, although they comply with all relevant legal requirements, lack contemporary electrical, mechanical, and ventilation systems and are not handicap accessible—problems "exacerbated by . . . age and decay." *Id.* ¶ 22. Today, to be minimally habitable and legally rentable, apartments in both of the Subject Buildings require electrical and plumbing fixture renovations, appliance repairs and replacements, and lead paint abatement. *Id.* ¶ 24. In addition to being less attractive, smaller, and laid-out in an inferior fashion, the Subject Buildings are allegedly less safe than the other thirteen buildings in the FAE complex as they can only be accessed via an interior courtyard invisible from the street and are farthest from amenities and businesses located on First Avenue and subway lines on or west of Lexington Avenue. *Id.* ¶ 25. "In sum," Stahl alleges, "the [Subject] Buildings are sub-par," have "a very limited appeal to a limited demographic," and are "capable of generating only meager rental income." *Id.* ¶ 26.

Hence, Stahl devoted considerable resources, including retaining an architectural firm and law firm, to prepare a redevelopment plan that would entail demolition of the Subject Buildings and construction of a modern condominium tower. *Id.* Yet Stahl could not implement its redevelopment plan until the Subject Buildings were unoccupied, and its ability to vacate many of the units within the Subject Buildings was constrained by rent control and stabilization laws. *Id.* ¶ 36. Moreover, many already-vacant units could not be leased without "substantial and costly renovations" required "just to bring them to a habitable level." *Id.* Thus, beginning in

2000, Stahl had left units vacant as tenants exited "in order to maximize the possibility of redeveloping the [Subject] Buildings at the appropriate time and avoid needlessly incurring the expense of repairs to Buildings it planned to replace." *Id.*[6]  Likewise, Stahl did not undertake "capital improvements" in the vacant apartments or the Subject Buildings themselves, ensuring only that they were continually maintained in accordance with the law. *Id.* ¶ 37.

### D.   2006 Landmark Designation

After Stahl informed the Community Board representing the Upper East Side of its plans to redevelop the Subject Buildings, the Commission scheduled a public hearing to revisit the issue of the Subject Buildings' inclusion in the FAE landmark designation. *Id.* ¶ 38.  In the Complaint, Stahl alleges that "the LPC's decision to reconsider the landmark status of the [Subject] Buildings was substantially motivated by ex parte communications and political pressure from local residents and groups." *Id.* ¶ 39.  Following a hearing on November 14, 2006, the Commission voted to overturn the BOE's earlier decision by modifying the FAE landmark designation to include the Subject Buildings. *Id.* ¶¶ 41, 45.  In its formal designation report (the "2006 Report"), the Commission stated that including the Subject Buildings in the FAE landmark designation would "enhance[] . . . understanding of the work of [CSHC] since the complex encompassed the earliest and latest examples of the light-court model tenements that characterized [CSHC's] urban development projects." *Id.* ¶ 47.   On February 1, 2007, the City Council voted to approve the Commission's decision. *Id.* ¶ 48.

Shortly thereafter, on May 31, 2007, Stahl filed an Article 78 petition to contest the Subject Buildings' designation, which the New York Supreme Court denied on September 24, 2008. *Id.* ¶ 49.  The Appellate Division, First Department, affirmed that decision on June 24,

---

[6] Although Stahl did not launch its redevelopment plan until 2004, it started allowing units to empty in 2000, in reliance on the Board's 1990 modification vote.  Compl. ¶ 71.

2010, *id.* ¶ 50, and on November 18, 2010, the New York Court of Appeals denied Stahl's

motion for leave to appeal.  *Id.* ¶ 51.  At that point, Stahl had exhausted its Article 78 challenge

to the Subject Buildings' designation as landmarks.  *Id.*

   **E.**  **Stahl's Hardship Application**

   Once the Subject Buildings were landmarked, Stahl could not proceed with its

redevelopment efforts without the Commission's approval.  *Id.* ¶ 52.[7]  Meanwhile, Stahl could

not re-rent the Subject Buildings' numerous vacant units without first spending millions of

dollars on renovations.  *Id.*  Consequently, Stahl sought redress—namely, permission to

demolish the Subject Buildings—under § 25-309 of the Landmarks Law, pursuant to which a

landowner may request a "certificate of appropriateness" authorizing demolition, alterations, or

reconstruction on the ground that a parcel of land "is not capable of earning a reasonable return."

*Id.* ¶¶ 53-54 (quoting N.Y.C. Admin. Code §§ 25-302(c), 25-309).  A "reasonable return" is

defined in the Landmarks Law as "an annual net return—*i.e.*, the amount by which income

exceeds operating expenses, excluding mortgage interest and amortization but including

depreciation—of [six percent] of a property's assessed value in a given test year."  *Id.* ¶ 55

(citing N.Y.C. Admin. Code §§ 25-302(v)(1)-(3)).

---

[7] Under the Landmarks Law, it is illegal for any person or entity in charge of a landmarked property "to alter, reconstruct or demolish any improvement" thereon without a permit from the Commission, usually granted in the form of a "certificate of no effect" or "certificate of appropriateness."  *Bd. of Managers of Soho Int'l Arts Condo. v. City of N.Y.*, No. 01 Civ. 1226 (DAB), 2004 WL 1982520, at *8 (S.D.N.Y. Sept. 8, 2004) (quoting N.Y.C. Admin. Code § 25-305).

Stahl submitted its request (the "Hardship Application") on October 7, 2010.  Doc. 15, Ex. C at 1.[8]  By that time, 107 of the Subject Buildings' 190 apartments were vacant.  *Id.* at 8.[9]  Stahl intended, if its Application was granted, to replace the Subject Buildings with modern mixed-income condominium towers in which "a large number of units" would be dedicated to affordable housing.  Compl. ¶¶ 57-58.  Stahl further promised the Commission that the proceeds from its redevelopment project would be used to renovate the Original Buildings within the FAE, and that the Subject Buildings' remaining tenants would be relocated to comparable or superior renovated apartments in the Original Buildings without any increase in rent.  *Id.* ¶ 59.  In support of its Application, Stahl submitted reports by a real estate valuation company and a construction cost consulting firm, both of which evaluated four "renovation scenarios" entailing varying levels of building and apartment renovations (*e.g.*, renovations to bring the apartments "up to code," renovations to make the apartments competitive on the rental market) and assessed whether any of these scenarios would allow Stahl to earn a reasonable return on its investment in the Subject Buildings.  *Id.* ¶ 63.

Over the course of nearly four years, the Commission sought additional materials from and posed various questions to Stahl regarding its Hardship Application and the calculations it contained.  Doc. 15, Ex. C at 3-7.  In addition, the Commission held three public hearings to address the Application on January 24, 2012, June 11, 2013, and October 29, 2013.  Compl. ¶ 60.  These hearings, according to Stahl, "were dominated by interest groups hostile to the prospect of any development."  *Id.*  Additionally, members of the Commission made statements at the

---

[8] Exhibit C, attached to a declaration by Defendants' Counsel Rachel K. Moston, is the Commission's 49-page "Denial of a Notice to Proceed" (the "Denial Report"), a report in which it outlines its determination of Stahl's Hardship Application.

[9] This number has only increased over the years.  As of the filing of the Complaint, 126 of the Subject Buildings' 190 apartments were vacant.  Compl. ¶ 24 n. 2.

hearings "suggesting that they had prejudged Stahl's application in the face of . . . political

pressure, and simply would not permit redevelopment or even entertain the possibility that an

actual hardship existed." *Id.* ¶ 61.  At the hearings, the Commission also heard from HR&A

Advisors, a consulting company representing opponents of Stahl's redevelopment plan, which

presented its own analysis regarding the possible return that Stahl could earn by leasing

apartments in the Subject Buildings.  Doc. 15, Ex. C at 3.

> According to Defendants, the Commission then evaluated Stahl's application as follows:
>
> LPC exercised its discretion in considering 24 renovation scenarios using some of
> the analyses and assumptions proffered by plaintiff, as well as many other scenarios
> with different assumptions that LPC determined were more reasonable.
> Specifically, LPC calculated income (e.g., rents and miscellaneous income) and
> determined the costs incurred by plaintiff in operating the property.   The
> Commission then determined whether the sum remaining, after subtracting
> projected expenses and operating costs from the income, was less than six percent
> of the post-renovation assessed value of the property. . . . In each instance, the
> Commission determined that plaintiff was able to realize a reasonable return. . . .
> Consequently, LPC found that plaintiff had failed to demonstrate – to the
> satisfaction of the Commission – that the properties were incapable of earning a
> reasonable return under the Landmarks Law.

Doc. 16 at 8.  Therefore, on May 20, 2014, the Commission voted to deny Stahl's Application

and, on May 29, 2014, issued a written decision (the "Denial Report"), which explained the

Commission's position that Stahl had not met its burden of establishing its inability to earn a rate

of return above six percent.  Compl. ¶¶ 64-65; *see* Doc. 15, Ex. C.

### F.    Procedural History

Stahl commenced this action on September 22, 2014, seeking an order:  (a) annulling and

setting aside the 2006 landmark designation and the denial of its Hardship Application;

(b) awarding compensatory damages; and (c) awarding attorneys' fees and costs.  Compl. at 23.

That same day, Stahl filed a separate action in New York Supreme Court under Article 78 of the

New York Civil Practice Laws and Rules ("C.P.L.R."), alleging that the Subject Buildings'

landmarks designation amounted to an unconstitutional taking and challenging the Commission's denial of its Hardship Application as arbitrary and capricious.  *See Stahl York Ave. Co. LLC v. City of New York*, Index No. 100999/2014, J. Stallman (Sup. Ct. N.Y. Co.); Doc. 15, Ex. D ¶¶ 120-63.[10]  In that case, which Stahl was required, by statute, to bring in New York state court, *see* N.Y. C.P.L.R. § 7804, Stahl seeks an order:  (a) annulling, vacating, and setting aside the denial of its Hardship Application; (b) awarding compensation based on the fair market value of the Subject Buildings as of the date of their designation as landmarks, plus interest; and (c) awarding attorneys' fees and costs.

Defendants now move to dismiss the instant Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that this Court should abstain from exercising its jurisdiction until the state action is resolved, and Rule 12(b)(6), arguing that the Complaint fails to state a claim upon which relief can be granted.  Doc. 14.

## II.   LEGAL STANDARDS

### A.      Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case.  Fed. R. Civ. P. 12(b)(1).  The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, evidence outside of the pleadings may be considered by the court to resolve the disputed jurisdictional fact issues.  *Zappia Middle E. Constr. Co. v.*

---

[10] Doc. 15, Ex. D contains Stahl's complaint in its pending Article 78 proceeding.

*Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *see also Morrison*, 547 F.3d at 170

(citing *Makarova*, 201 F.3d at 113).  When evaluating a motion to dismiss for lack of subject

matter jurisdiction, the court accepts all material factual allegations in the complaint as true but

does not necessarily draw inferences from the complaint favorable to the plaintiff.  *J.S. ex rel.*

*N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v.*

*Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

Where, as here, a party also seeks dismissal on Rule 12(b)(6) grounds, the court must

consider the Rule 12(b)(1) motion first, *Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820

F. Supp. 2d 490, 499 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 131 (2d Cir. 2012), because

"disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of

jurisdiction."  *Chambers v. Wright,* No. 05 Civ. 9915 (WHP), 2007 WL 4462181, at *2

(S.D.N.Y. Dec. 19, 2007) (quoting *Magee v. Nassau Cnty. Med. Ctr.,* 27 F. Supp. 2d 154, 158

(E.D.N.Y. 1998)).

**B.      Rule 12(b)(6)**

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all

factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's

favor.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  However, the Court is

not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a

cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a

motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief

that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially

plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### C.      Section 1983

To prevail on a cause of action under 42 U.S.C. § 1983, a plaintiff must establish, by a preponderance of the evidence, that (1) the defendant deprived it of a right secured by the Constitution or the laws of the United States and (2) in doing so, the defendant acted under color of state law.  *See, e.g.*, *Byng v. Delta Recovery Servs. LLC*, 568 F. App'x 65, 66 (2d Cir. 2014) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

### III.     DISCUSSION

#### A.      *Colorado River* Abstention

Defendants argue that this Court should abstain, pursuant to the *Colorado River* abstention doctrine, from exercising jurisdiction over Stahl's due process claim on the grounds that Stahl's New York Supreme Court case will "likely render the instant action moot."  Doc. 16 at 2.[11]  At a minimum, Defendants argue that the Court should stay this action pending the outcome of the Article 78 proceedings.  *Id.*  A motion to dismiss based on *Colorado River* is considered as a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 862 F. Supp. 2d 170, 181 n. 11 (E.D.N.Y. 2012) (citation omitted).

---

[11] Although Defendants initially argued that the Court should abstain from exercising its jurisdiction pursuant to the doctrines of *Colorado River* abstention and *Younger* abstention, they withdrew the latter argument in their reply brief in light of controlling Second Circuit precedent that was not referenced in their initial moving papers.  *See* Defs.' Reply at 1 (Doc. 19) (citing *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584 (2013)).

"Generally, as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the [f]ederal court having jurisdiction.'" *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976) (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)).  However, the Supreme Court has recognized several categories of circumstances in which abstention may be appropriate. *See, e.g.*, *id.* at 814; *Younger v. Harris,* 401 U.S. 37, 43-44 (1971); *Burford v. Sun Oil Co.*, 319 U.S. 315, 332 (1943); *R.R. Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 498 (1941).  These abstention doctrines pose "extraordinary and narrow exception[s]" to "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River*, 424 U.S. at 813, 817 (citations omitted).

In *Colorado River*, the Court held that "in situations involving the contemporaneous exercise of concurrent jurisdiction," a federal court, in "exceptional" circumstances, may abstain from exercising jurisdiction if parallel state-court litigation might result in "comprehensive disposition of litigation" and abstention would conserve judicial resources.  *Id.* at 813, 817-18 (internal brackets and quotation marks omitted).  To determine whether *Colorado River* abstention is appropriate, the court considers six factors, "with the balance heavily weighted in favor of the exercise of jurisdiction," *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 16 (U.S. 1983)):

> (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights.

14

*Woodford v. Cmty. Action Agency of Greene County, Inc.*, 239 F.3d 517, 522 (2d Cir. 2001). No

one factor is decisive; instead, a court must engage in a "carefully considered judgment[,] taking

into account both the obligation to exercise jurisdiction and the combination of factors

counselling against that exercise." *Colorado River,* 424 U.S. at 818 (citation omitted); *see also*

*Moses H. Cone,* 460 U.S. at 16 (explaining that the "weight to be given to any one factor may

vary greatly from case to case, depending on the particular setting of the case"). Moreover, the

facial neutrality of a factor "is a basis for retaining jurisdiction, not for yielding it." *Woodford*,

239 F.3d at 522.

### 1.      The State and Federal Actions Are Parallel

Before engaging in the six-factor analysis, however, a court must make a threshold

determination that the federal and state court cases are "parallel." *Dittmer v. County of Suffolk,*

146 F.3d 113, 118 (2d Cir. 1998). Federal and state proceedings are "parallel" for abstention

purposes when the two proceedings "are essentially the same," meaning that "there is an identity

of parties, and the issues and relief sought are the same." *Shields v. Murdoch*, 891 F. Supp. 2d

567, 577 (S.D.N.Y. 2012) (internal quotation marks and citation omitted). Nevertheless,

"[p]erfect symmetry of parties and issues is not required. Rather, parallelism is achieved where

there is a substantial likelihood that the state litigation will dispose of *all* claims presented in the

federal case." *Id.* (quoting *In re Converse Tech., Inc.,* No. 06 Civ. 1849 (NGG) (RER), 2006

WL 3193709, at *2 (E.D.N.Y. Nov. 2, 2006)) (emphasis in original) (internal quotation marks

omitted). Yet if the court has "[a]ny doubt" regarding the parallel nature of the two actions, the

outcome should be resolved in favor of exercising federal jurisdiction. *Id.*

While the forms of relief sought by plaintiff in this case and the state action are not

perfectly coextensive—here, Stahl seeks money damages in addition to injunctive and

declaratory relief—the cases are undoubtedly parallel for the purposes of the *Colorado River* abstention doctrine.  The parties and allegations in the two cases are identical, and Plaintiff's primary goal in both is to overturn the Commission's denial of its Hardship Application and gain permission to develop the Subject Buildings.

### 2.    Dismissal is Not Required

Although the federal and state actions are parallel, abstention would not be appropriate because the *Colorado River* factors weigh in favor of this Court's exercise of federal jurisdiction.

### a.    Jurisdiction Over a Res and Convenience of Forum

The parties agree that the first two factors—(1) whether the state or federal court has assumed jurisdiction over any res or property, and (2) the inconvenience of the federal forum— are not implicated here.  *See* Doc. 16 at 17; Pl.'s Mem. Law Opp'n Mot. to Dismiss at 11 (Doc. 17).  Accordingly, both factors counsel against abstention.  *See De Cisneros v. Younger*, 871 F.2d 305, 307 (2d Cir. 1989) ("The first two factors are not implicated in this appeal, but the absence of jurisdiction over a *res,* and the convenience of the federal forum both point toward exercise of federal jurisdiction.") (citing *Bethlehem Contracting Co. v. Lehrer/McGovern Inc.*, 800 F.2d 325, 327 (2d Cir. 1986)); *see also Vill. of Westfield v. Welch's*, 170 F.3d 116, 122 (2d Cir. 1999) ("[W]here the federal court is just as convenient as the state court, that factor favors retention of the case in federal court.") (internal quotation marks and citation omitted).

### b.    Avoidance of Piecemeal Litigation

The third *Colorado River* factor involves an analysis of whether the federal action must be dismissed in order to prevent piecemeal litigation.  *Id.* at 123.  The "primary context in which [the Second Circuit] ha[s] affirmed *Colorado River* abstention in order to avoid piecemeal adjudication has involved lawsuits that posed a risk of inconsistent outcomes not preventable by

principles of res judicata and collateral estoppel." *Woodford*, 239 F.3d at 524; *see also Shields*, 891 F. Supp. 2d at 582-83 ("[A]bstention is more appropriate where the parties to both suits are not identical because there is a possibility that the parties who are not bound by the prior judgment may cause inconsistent judgments in subsequent lawsuits.") (citation omitted); *Tarka v. Greenfield Stein & Senior, LLP*, No. 00 Civ. 1262 (SAS), 2000 WL 1121557, at *5 (S.D.N.Y. Aug. 8, 2000) ("Courts have been careful . . . to draw a distinction between merely duplicative litigation and potentially piecemeal litigation, noting that the latter is a product of additional parties.").  In this case, by comparison, "the nature of the parallel actions is such that principles of res judicata and collateral estoppel should be effective to prevent inconsistent outcomes." *CVR Energy, Inc. v. Wachtell, Lipton, Rosen & Katz*, No. 14 Civ. 6566 (RJS), 2014 WL 7399040, at *4 (S.D.N.Y. Dec. 29, 2014); *see also Colony Ins. Co. v. Danica Grp., LLC*, No. 13 Civ. 1714 (RRM), 2014 WL 4417353, at *7 (E.D.N.Y. Sept. 8, 2014) (noting that collateral estoppel would likely preclude courts from reaching inconsistent outcomes in state and federal cases with identical parties and issues).

This factor, like all of the *Colorado River* factors, is not determinative, and courts in the Second Circuit have abstained based on other considerations even where the applicability of res judicata and collateral estoppel mitigated the risk of piecemeal litigation.  *See id.* (concluding that, "even where principles of res judicata and collateral estoppel would apply, the risks of duplicative litigation and an unseemly race to judgment weigh[ed] in favor of abstaining").  Still, courts are directed to consider each *Colorado River* factor with the balance weighted heavily toward the exercise of federal jurisdiction, and the "mere potential for conflicting outcome[s] between . . . two actions does not justify abstention under the piecemeal litigation factor." *Shields*, 891 F. Supp. 2d at 582 (quoting *In re Bank of Am. Corp. Secs.,* 757 F. Supp. 2d 260, 345

(S.D.N.Y. 2010)) (internal quotation marks omitted).  That potential is "always present" in

parallel actions, and "the courts must look beyond this factor to ascertain whether abstention is

appropriate."  *Id.* (citing *In re Comverse*, 2006 WL 3193709, at *6).

Here, although failing to stay or dismiss the federal action might lead to "some amount of

duplication" due to the similar factual and legal issues presented in the Article 78 proceedings,

such duplication "does not weigh significantly in favor of abstention."  *Id.* at 582 (internal

quotation marks and citation omitted).  Because "any case involving parallel proceedings

presents a risk of duplicative litigation or a rush to judgment, the existence of those risks can

weigh only modestly in favor of dismissal; otherwise dismissals pursuant to *Colorado River*

would be the rule, not the exception, in cases involving parallel proceedings in state and federal

court."  *In re Asbestos Litig.*, 963 F. Supp. 247, 253 (S.D.N.Y. 1997) (internal quotation marks

and citation omitted).  Where avoidance of piecemeal litigation is the sole *Colorado River* factor

weighing in favor of abstention and all other factors counsel the Court to retain its jurisdiction,

the Court must not abstain.  *See In re Comverse Tech.*, 2006 WL 3193709, at *6.

### c.   Order in Which Jurisdiction Was Obtained

The fourth *Colorado River* factor involves an analysis of "the order in which jurisdiction

was obtained."  *Vill. of Westfield,* 170 F.3d at 121.  "This factor does not turn exclusively on the

sequence in which the cases were filed, but rather in terms of how much progress has been made

in the two actions." *Id.* at 122 (citing *Moses H. Cone,* 460 U.S. at 21) (internal quotation marks

omitted).

Stahl commenced both actions on the same day, September 22, 2014.  Although

Defendants contend that the "state court case is substantially more advanced," Doc. 16 at 19,

their argument is speculative:  "[T]hat matter will be fully submitted to the Motion Submissions

Part on March 2, 2015 – a mere few days after the filing of this motion.  As there is no discovery permitted in Article 78 proceedings (which are designated 'summary proceedings'), the state court will likely render a decision on the Article 78 claims shortly thereafter." *Id.* (citing C.P.L.R. § 7800 *et seq.*).  Stahl asserts that "no decision on the merits—indeed, no decision of any sort—has been made in the state court action" and that the parties are still awaiting a decision from the state court regarding Stahl's motion for oral argument and for leave to file a sur-reply in that case.  Doc. 17 at 13.  As of the publication of this Opinion, to this Court's knowledge, no decision has been rendered in the state action.  *See Stahl*, Index No. 100999/2014. The neutrality of this factor, accordingly, tips in favor of this Court retaining jurisdiction.

### d.        Law Supplying the Rule of Decision

The fifth *Colorado River* factor requires a review of what law provides the rule of decision in the case.  *See Moses H. Cone,* 460 U.S. at 23.  "[W]hen the applicable substantive law is federal, abstention is disfavored," and even "the absence of federal issues does not strongly advise dismissal, unless the state law issues are novel or particularly complex." *Vill. of Westfield,* 170 F.3d at 124 (internal quotation marks omitted).  Nor does the existence of state law issues mandate abstention:  "[T]he Supreme Court has directed that although in some rare circumstances the presence of state-law issues may weigh in favor of a federal court's surrender of its jurisdiction, the presence of federal-law issues must always be a major consideration weighing against surrender." *Niagara Mohawk*, 673 F.3d at 103 (quoting *Moses H. Cone*, 460 U.S. at 26) (internal quotation marks omitted).

In this case, Plaintiff's substantive due process claim obviously implicates federal principles under the United States Constitution.  Yet Stahl's due process claim also turns on an analysis of the Landmarks Law.  *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) ("Property

interests . . . are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ."); *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir. 2007) (applying New York law to determine whether plaintiffs had a protectable property right).  Defendants suggest that the state law issues presented in this case are "novel and complex," entailing a review of the Commission's "complicated analyses as to whether [Stahl] satisfied its burden of establishing economic hardship under the New York City Landmarks Law."  Def.'s Reply at 5 (Doc. 19).  Stahl, on the other hand, argues that any state law issues implicated by its claim "merely go to the LPC's failure to abide by the clear definitions of the Landmarks Law and its own precedent."  Doc. 17 at 14-15 (citing Compl. ¶ 65).

The Court, as explained *infra*, is not persuaded by Stahl's argument regarding the clarity of the Landmarks Law as it impacts the due process claim here at issue.  However, neither is the Law so murky as to advise abstention.  While it is certainly true that the factual and procedural context of this case is unique, it is also true that federal courts in this circuit have frequently considered nuanced constitutional claims arising from the Landmarks Law.  *See, e.g.*, *Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. City of New York*, 914 F.2d 348, 350 (2d Cir. 1990) (holding that Landmarks Law did not unconstitutionally burden the free exercise of religion or effect an unconstitutional taking when it prevented a church from replacing a church-owned building with an office tower); *Bd. of Managers of Soho Int'l Arts Condo. v. City of N.Y.*, No. 01 Civ. 1226 (DAB), 2004 WL 1982520, at *1 (S.D.N.Y. Sept. 8, 2004) (denying summary judgment where plaintiff alleged that the LPC had violated its First, Fifth, and Fourteenth Amendment rights, and its rights under the New York State Constitution and New York state law, when it prevented permanent removal of an artwork installed on a

building's exterior).  Here, at base, the Court is being asked to determine whether the

Commission was within its rights to engage in mathematical calculations different from those

used by Stahl to determine, to its satisfaction, that Stahl had not met its burden of establishing

financial hardship.  The state law issues presented are not sufficiently novel and complex as to

merit abstention when no other *Colorado River* factor weighs clearly in favor of it.

### e.        Adequate Protection of Plaintiff's Rights

When reviewing the sixth *Colorado River* factor, a federal court must determine

"whether the 'parallel state-court litigation will be an adequate vehicle for the complete and

prompt resolution of the issues between the parties.'"  *Vill. of Westfield,* 170 F.3d at 124 (quoting

*Moses H. Cone,* 460 U.S. at 28).  "If there is any substantial doubt as to this, it would be a

serious abuse of discretion to grant the stay or dismissal at all."  *Moses H. Cone,* 460 U.S. at 28.

Here, there is no serious question that the state action can adequately protect Plaintiff's

procedural and substantive rights and provide a fair forum that will promptly resolve the parties'

claims.  Stahl has not identified any conceivable jeopardy or prejudice to its rights should its

claims be decided by the state court rather than this court.  Nevertheless, the ability of the state

court to adequately protect Stahl's interests only makes this factor neutral.  *See Estee Lauder*

*Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 169 (S.D.N.Y. 2006).  "Although any possible

inadequacy of the state forum to protect the federal plaintiff's rights would provide a strong

reason to exercise federal jurisdiction, the adequacy of the state forum does not weigh heavily in

favor of dismissal pursuant to *Colorado River*."  *Id.* (quoting *In re Asbestos Litig.,* 963 F. Supp.

at 253) (internal quotation marks omitted); *see also Dunkin' Donuts Franchised Restaurants*

*LLC v. Rijay, Inc.*, No. 06 Civ. 8237 (WCC), 2007 WL 1459289, at *6 (S.D.N.Y. May 16, 2007)

("The fact that the state court is competent to adjudicate plaintiff's claims is largely irrelevant.").

f.      *Colorado River* **Abstention is Not Warranted**

The "exceptional circumstances" that would be required to support this Court's abstention under *Colorado River* are not present in this case.  *See Vill. of Westfield,* 170 F.3d at 124.  Of the six *Colorado River* factors, only two weigh moderately in favor of abstention here: the goal of avoiding piecemeal litigation and the presence of state law issues.  Moreover, because the parties to both actions are identical, the risk of piecemeal litigation is mitigated by the likely applicability of res judicata and collateral estoppel, and the state law issues presented are not so novel or complex as to merit abstention.  Therefore, although this course of action "will undoubtedly result in two courts considering the same action at the same time, case law from this Circuit interpreting Supreme Court precedent renders duplicative litigation, by itself, an insufficient basis for abstaining."  *CVR Energy*, 2014 WL 7399040, at *6 (citing *Woodford,* 239 F.3d at 522); *see also Moses H. Cone,* 460 U.S. at 16 ("Only the clearest of justifications will warrant dismissal.") (quoting *Colorado River,* 424 U.S. at 819) (internal quotation marks omitted).  Consequently, the Court does not grant Defendants' motion to dismiss or stay this action pursuant to Rule 12(b)(1) and the *Colorado River* doctrine.

**B.      Failure to State a Claim**

Defendants contend that, even if this Court declines to abstain under *Colorado River*, it must dismiss Stahl's Complaint pursuant to Rule 12(b)(6) for its failure to state a claim.  To state a claim for a substantive due process violation based on the denial of its Hardship Application, Stahl must allege, first, that it possessed a "valid property interest"—that is, a property interest "protected" within the meaning of the Fourteenth Amendment—and, second, that Defendants infringed upon that interest in an arbitrary or irrational manner.  *See Cine SK8*, 507 F.3d at 784; *Brady v. Town of Colchester*, 863 F. 2d 205, 211 (2d Cir. 1988) (internal quotation marks

omitted). Here, because the Court finds that Plaintiff lacks a valid property interest, it need not address the second step of the due process analysis. *See Clubside, Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir. 2006).

To possess a federally protected property interest, a person must have a "legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577; *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) (quoting *RRI Realty Corp. v. Incorporated Village of Southampton*, 870 F.2d 911, 915 (2d Cir. 1989), *cert. denied*, 493 U.S. 893 (1989), and *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 58 (2d Cir. 1985)). Such a claim arises not from the Constitution, but rather from an independent source such as state or local law. *See Brady*, 863 F. 2d at 212 (quoting *Roth*, 408 U.S. at 577). A plaintiff's "abstract need, desire or unilateral expectation is not enough" to form an entitlement. *Abramson v. Pataki*, 278 F.3d 93, 99 (2d Cir. 2002) (citations omitted).

The "strict" or "clear" entitlement analysis employed in the Second Circuit "focuses on the extent to which the deciding authority may exercise *discretion* in arriving at a decision, rather than on an estimate of the probability that the authority will make a specific decision." *Zahra*, 48 F.3d at 680 (emphasis in original); *see also Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). "Even if in a particular case, objective observers would estimate that the probability of issuance was extremely high, the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected property interest." *RRI Realty*, 870 F.2d at 918. Therefore, "to establish a federally protectable property interest in a state or local permit," a plaintiff must demonstrate that "there was no uncertainty regarding his entitlement to it under applicable state or local law, and the issuing authority had no discretion to withhold it in his particular case." *Natale*, 170 F.3d at 263 n. 1. This standard aims to prevent federal courts from being "turned into zoning boards of appeals" or "substituted for state courts as adjudicators

23

of the meaning of zoning and other land use regulations." *Id.* (citing *Village of Belle Terre v. Boraas,* 416 U.S. 1, 13 (1974) (Marshall, J. dissenting)); *RRI Realty,* 870 F.2d at 918.

In this action, Stahl asserts a property interest in a "preliminary determination of insufficient return," or a "hardship finding," pursuant to § 25-309(a) of the Landmarks Law. That section provides in relevant part that where an applicant "establishes to the satisfaction of the commission" that an "improvement parcel . . . is not capable of earning a reasonable return" and that the owner "seeks in good faith" to demolish the "improvement" immediately and construct a new building, the Commission "shall . . . make a preliminary determination of insufficient return." N.Y.C. Admin. Code § 25-309(a).[12]  Stahl contends that it had a protected property interest in a hardship finding because the Landmarks Law and Commission precedent "establish a clear legal standard" that the Commission must apply in reviewing hardship applications. Doc. 17 at 17. In other words, it is Stahl's position that there is one specific method, which the Commission was obligated to accept, for calculating the rate of return that Stahl was capable of earning on the Subject Buildings. Thus, Stahl argues that because it "demonstrated conclusively . . . that it was incapable of earning a reasonable rate of return as defined by the Landmarks Law," it established that it had suffered an economic hardship and was entitled to affirmative relief.[13]  Compl. ¶¶ 76-77. This argument fails.

---

[12] As previously noted, under the Landmarks Law, a reasonable return is an annual net return of six percent or more of a property's value in a specified test year. N.Y. Admin. Code §§ 25-302(v)(1)-(3)). An "improvement" is defined as "[a]ny building, structure, place, work of art or other object constituting a physical betterment of real property, or any part of such betterment." *Id.* § 25-302(i). An "improvement parcel" is the "unit of real property which (1) includes a physical betterment constituting an improvement and the land embracing the site thereof, and (2) is treated as a single entity for purposes of levying real estate taxes." *Id.* § 302(j).

[13] Relief under this provision may include partial or complete tax exemption, tax remission, or authorization for alternations, construction, and reconstruction where deemed appropriate and consistent with the purposes of the Landmarks Law. *Id.* § 25-309(b)-(c), (g).

Stahl emphasizes § 25-309's use of the word "shall," which, it reasons, allows the Commission "no discretion not to make [a] finding" once a hardship applicant makes the requisite showing that it cannot earn a reasonable rate of return. Doc. 17 at 18. To be sure, the Second Circuit Court of Appeals has recognized the force of the word "shall," as compared to words such as "may," in regulations directing governmental action in the context of land use or zoning matters. *See Sullivan v. Town of Salem*, 805 F.2d 81, 84 (2d Cir. 1986) ("The statutory authority granted to a Connecticut municipality to accept as a public highway any proposed highway within its borders is a discretionary 'may,' not a mandatory 'shall.'"); *compare Deane v. City of New York Dep't of Bldgs.*, 677 N.Y.S.2d 416, 421 (N.Y. Sup. Ct. 1998) (observing that "use of the word 'may'" in the Landmarks Law "vests the [LPC] with discretion over all acts taken or made pursuant to that provision") (citations omitted). However, the Court's analysis cannot end there; indeed, it cannot begin there.

The command that the Commission *shall* make a finding of insufficient return is triggered only when certain criteria are met *to the satisfaction of the Commission*. *See* N.Y.C. Admin. Code § 25-309(a)(1). This language vests authority in the Commission to determine whether or not an applicant has demonstrated that its improvement parcel is incapable of earning a reasonable rate of return and, consequently, whether or not the Commission is obligated to make a preliminary hardship finding. *Id.* And while Stahl asserts that the parameters of the Commission's "satisfaction" are cabined by the text of the Landmarks Law, the Law simply does not provide a single, one-size fits all formula for determining a reasonable rate of return.

Stahl's own Hardship Application proves the point. In its Application, Stahl analyzed four different "renovation scenarios," each resting on different assumptions. The assumptions themselves spanned a wide range of contingencies. Thus, while Stahl may be correct that the

Commission was required to utilize a particular mathematical formula to determine the net annual return, it is wrong when it suggests that the Commission was obligated to accept the *assumptions* on which Stahl's calculations were premised.

In this regard, two aspects of the Law are particularly instructive.  First, the Landmarks Law defines "capable of earning a reasonable return" as "[h]aving the capacity, *under reasonably efficient and prudent management*, of earning a reasonable return." *Id.* § 25-302(c) (emphasis added).  For purposes of this definition, the "net annual return," is "presumed to be the earning capacity of such improvement parcel, *in the absence of substantial grounds for a contrary determination by the [C]ommission*." *Id.* (emphasis added).  In other words, the Commission is not required to blindly accept the assumptions on which a petitioner may rely and is plainly granted the discretion to subject the assumptions to its own determination of reasonableness.  Second, the Law specifically requires the eleven member Commission to include at least three architects, one historian qualified in the field, one city planner or landscape architect, and one licensed realtor.  Doc. 16 at 3 (citing New York City Charter § 3020(1)).  The New York Court of Appeals has therefore observed that the Commission is comprised of experts whose interpretations of the Landmarks Law are entitled to deference by the Courts.  *See Teachers Ins. & Annuity Ass'n v. City of New York*, 82 N.Y.2d 35, 42 (1993); *Stahl*, 76 A.D.3d at 295.  Here, there is no question that the Commission rejected certain of the assumptions relied on by Stahl on the basis that the assumptions were inconsistent with the efficient and prudent management of the Subject Buildings.  There is also no question that the Commission was well within its rights to exercise this level of discretion.

In its decision, the Commission provided a detailed explanation of the assumptions it rejected and those upon which it relied.  *See* Doc. 15, Ex. C at 10-32.  For example:  The

Commission determined that the proper "improvement parcel" for purposes of assessing Stahl's potential return was the entire FAE block rather than the Subject Buildings alone, *id.* at 10-12;[14] it elected to use the "income approach" rather than the "cost approach" in calculating Stahl's potential rate of return, *id.* at 25-26; it determined that Stahl's decision not to re-rent apartments vacated after the 2006 landmark designation "was a conscious business decision" such that any resulting costs were a "self-imposed hardship," *id.* at 12; it observed the laxity of Stahl's rental office's effort to re-rent the apartments or increase their value, *id.* at 11-12, 18; it calculated the amount of net rentable square footage in the Subject Buildings, *id.* at 31; it disagreed with Stahl regarding the number of windows that needed replacement and the cost of replacing those windows, *id.* at 23-24; it identified other sources of income potential, ignored by Stahl, within the improvement parcel (such as laundry facilities, basement storage, cell antenna rental, etc.), *id.* at 20-21; and it calculated the amount in rent, per leasable square foot, that the apartments could conceivably generate based on different levels of renovations, as well as Stahl's projected gross rental income according to these different renovation scenarios.  *Id.* at 13-16.  Ultimately, the Denial Report vividly illustrates the scope of the Commission's discretion.

Stahl endeavors to buttress its claim by arguing that the Commission's discretion was circumscribed by its own precedent as well as by the Landmarks Law.  In particular, Stahl refers to the 1988 decision issued by the Commission in the matter of KiSKA Developers, Inc.

---

[14] Stahl maintains that, pursuant to § 25-302(j), the Commission was required to consider only Stahl's rate of return on the parcel of land containing the Subject Buildings, treated as a separate unit for purposes of levying real estate taxes, as opposed to the entire FAE.  Doc. 17 at 18.  The Commission squarely addresses and defeats this argument in its Denial Report.  Doc. 15, Ex. C at 10-11 (explaining the Commission's finding that the relevant "improvement parcel" for Stahl's Application was "all of the lots on Block 1459," or the entire FAE).  Moreover, the Commission's finding regarding the proper "improvement parcel" was not determinative of Stahl's application.  Rather, as the Denial Report explains, despite the Commission's finding "that the improvement parcel for purposes of [Stahl's] hardship application should be Manhattan Tax Block 1459 in its entirety," the Commission still analyzed the application solely with respect to the Subject Buildings on lot 22, as desired by Stahl.  *Id.* at 12.

("KiSKA").[15]  *See* Doc. 17 at 20 ("The Landmarks Law and KiSKA dictate a set approach to

evaluating Stahl's hardship application, and within this framework, Stahl's application met every

standard necessary for a finding that it had suffered an economic hardship as a result of the

landmark designation."); *id.* at 18 ("[A]s a matter of New York law, an administrative agency is

required to follow its own precedent.") (citing *In re Charles A. Field Delivery Serv., Inc.*, 66

N.Y.2d 516, 518 (1985)).  Yet Stahl's reliance on KiSKA actually emphasizes the extent of the

Commission's discretion.  In that matter, the Commission made a preliminary hardship finding

and granted certificates of appropriateness to demolish three structures on Central Park West

owned by KiSKA.  Doc. 18, Ex. A at 1.  In so doing, the Commission made a series of decisions

that informed its conclusion on hardship.  For example:  it decided to consider each of the three

buildings on an individual basis, based on the fact that they had been separately landmarked; it

determined the proper measure of present value for each building; it concluded that the buildings

were uninhabitable in their current condition; it determined the proper method for calculating the

buildings' potential post-renovation value; and it calculated how much renovations would

increase the buildings' assessed value.  *Id.* at 19-26.

 Moreover, it is evident that the Commission *did* rely on KiSKA for guidance.  *See, e.g.*,

Doc. 15, Ex. C at 17 n. 23 (comparing the Commission's omission of "a vacancy and collection

loss factor" in KiSKA with its decision to include such a factor in its Stahl analysis in light of the

large number of apartments in the Subject Buildings); *id.* at 23 ("While normally soft costs are

not depreciable, since the Commission allowed some soft costs to be included in the KiSKA

decision, it finds that some soft costs should be included in the depreciation allowance."); *id.* at

25 (deciding not to include loan interest in the "soft cost allowance," given that "the only

---

[15] The KiSKA decision is attached to the Declaration of Plaintiff's Counsel Alexandra Shapiro.  Doc. 18, Ex. A.

explicitly loan-related item included in the list of soft costs [in KiSKA] was the mortgage recording tax"); *id.* at 27 (noting that the use of the income approach would be consistent with the Commission's approach in KiSKA). To the extent that KiSKA established administrative precedent, the Commission attempted to follow it while still addressing the inherently unique issues presented by the Subject Buildings and Stahl's proposal.[16]

In conclusion, the Commission's discretion is far from "so narrowly circumscribed that approval of a proper application is virtually assured." *Clubside*, 468 F.3d at 152-53 (quoting *RRI Realty,* 870 F.2d at 911); *see also Daxor Corp. v. State Dep't of Health*, 90 N.Y.2d 89, 99 (1997) ("While the 'theoretical possibility of discretionary action does not automatically classify an application for a license or a certificate as a mere 'unilateral hope or expectation,' here we do not need to consider precisely how much discretion defeats an entitlement because it is clear that the law vests appellant with considerable discretion . . . .") (quoting *Sullivan,* 805 F.2d at 85). Under New York law, "[i]t is the [person's] legitimate expectation of the benefit which creates the protected constitutional interest," rather than "the possibility that a benefit may be received," and "the structure of the decision-making process is at least as important as the likely result of the process." *Doe v. Coughlin*, 71 N.Y.2d 48, 55 (1987) (citations omitted). Here, the Commission's decision-making process involved an extensive amount of discretion, rendering Stahl's chances of obtaining a hardship finding uncertain at best. Stahl's claim—that the Commission exceeded the bounds of its authority by exercising this discretion—"would make the Board nothing more than a rubber stamp and reduce its role in the process to a rote check of whether the proper filings had been made." *Harlen Associates v. Inc. Vill. of Mineola*, 273 F.3d

---

[16] Although Stahl maintains that the Commission applied the "income approach" in its review of the Hardship Application here at issue despite having used the "cost approach" in KiSKA, the Commission disagreed with this categorization in its Denial Report. Doc. 15, Ex. C at 27 n. 45 ("Stahl is incorrect when it alleges the Commission 'used' the cost approach in the KiSKA hardship application.").

494, 504 (2d Cir. 2001); *see also Zahra*, 48 F.3d at 681 ("While we acknowledge that, in certain circumstances, a party may have a constitutionally [protectable] 'property interest' in a benefit that affects land use[,] . . . we do not recognize, at least on the facts of this case, the existence of such a 'property interest' in the *procedures* giving rise to such an interest.") (emphasis in original) (citations omitted).  Such a result would be "diametrically opposed" to the City's intent in drafting a Landmarks Law that tasks an expert Commission with the delicate task of balancing the protection of landmarks with the protection of private landowners' ability to earn a reasonable return on their investments.  *Harlen*, 273 F.3d at 504.  Accordingly, the Court concludes that Stahl fails to state a constitutionally protected property interest and, by extension, a valid § 1983 claim.

## IV.   CONCLUSION

For the reasons stated above, Defendants' motion to dismiss Stahl's § 1983 claim is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 14, and close the case.

It is SO ORDERED.

Dated:  May 21, 2015
           New York, New York

Edgardo Ramos, U.S.D.J.

30